**Affirmed in Part; Reversed in Part; Remanded; and Opinion and Concurring and Dissenting Opinion filed December 21, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-16-00715-CV

---

## MARY ANN YAMIN, TEXAS BLACK IRON, INC., AND 5310 WOODWAY, LLC, Appellants

### V.

## CARROLL WAYNE CONN, L.P, Appellee

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2013-47764**

---

### O P I N I O N

This appeal from the judgment rendered after a jury trial is primarily concerned with a judgment creditor's ability to levy execution on the shares and assets of a corporation allegedly formed by the debtor's wife while the couple was insolvent. The share certificate states that the shares are the wife's separate property, and the couple additionally executed a bill of sale transferring the husband's

community-property interest in the shares to the wife's separate estate. Years later, the couple also executed and recorded a partition agreement making the bill of sale public and transferring additional property.

The creditor sued the couple and the corporation to have the bill of sale and the partition agreement set aside as fraudulent under the Texas Family Code and the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *See* TEX. FAM. CODE ANN. § 4.106(a) (West 2006); TEX. BUS. & COM. CODE ANN. §§ 24.001–.013 (West 2015 & Supp. 2018). The creditor also sought to levy execution on the corporation's assets under a theory of outsider reverse veil-piercing. With the exception of one time-barred claim, the creditor prevailed on every theory and the trial court awarded the creditor attorney's fees and the right to levy execution on the corporation's shares and assets.

In this appeal by the corporation and the debtor's wife,[1] we affirm the judgment except for the trial court's ruling on attorney's fees. Because the trial court erred in holding the corporation liable for attorney's fees, and because the creditor failed to adequately segregate non-recoverable from recoverable fees, we reverse the award of attorney's fees, affirm the remainder of the judgment, and remand the cause to the trial court for relitigation only of the issue of attorney's fees.

## I. BACKGROUND

In 2004, Stephen Yamin Sr. guaranteed the debt of Junior Motorcycles of Houston LLC d/b/a Yamin Motorcycles to its landlord Carroll Wayne Conn, L.P. ("Conn").[2] Stephen acknowledged in the guaranty agreement that the agreement

---

[1] Another corporation, 5310 Woodway, LLC, also appeals, but judgment was not rendered against it.

[2] Because several members share the same last name, we refer to all of the members of the Yamin family by their first names.

induced Conn to reinstate the lease. Although the company was owned by his son, Stephen ran Yamin Motorcycles as its president or general manager.

Yamin Motorcycles defaulted on its lease and was evicted. Conn sued Stephen on the guaranty, and in the 2010 judgment in that case, Conn was awarded $316,294.66 in damages, $10,625.00 in trial attorney's fees, and conditional appellate attorney's fees of up to $35,000.00. Stephen has paid nothing on the judgment.

## A. Texas Black Iron, Inc.

In 2006, the Yamins had no income. They were insolvent and were being supported by their daughter Gina.

On July 28th of that year, Mary Ann Yamin formed Texas Black Iron, Inc. ("Black Iron"). Stephen testified in his deposition that there were outstanding judgments against him when Black Iron was formed, but he stated at trial that he believed the judgments were settled in 2004 and 2005, or that one judgment was still outstanding in 2006.

Black Iron's share certificate states that the shares are the "Sole & Separate Property of Mary Ann Yamin." Mary Ann testified in her deposition that she did not recall the source of the money used to start the company, but she testified at trial that she founded the company using $1,000.00 that she received as a gift from Gina. Gina testified that she remembered her mother talking about starting a pipe company and that Gina gave Mary Ann $1,000.00 at Mary Ann's request. Gina stated she does not know what her mother did with the money.

Stephen runs Black Iron and pays for all of the Yamins' personal expenses—including yachts, jewelry, homes, furnishings, vacations, and hundreds of thousands of dollars in gifts to family members—directly from Black Iron's accounts. Stephen

3

testified that both he and Mary Ann are signatories on Black Iron's accounts. Stephen also has a signature stamp of Mary Ann's name, which he uses at his complete discretion.

## B.    The 2006 Bill of Sale

On an unknown date, Stephen and Mary Ann also executed a Bill of Sale in which Stephen purported to sell and transfer to Mary Ann, as her sole and separate property, "[a]ll of my interest, if any, including future income and enhancements therefrom, in Texas Black Iron, Inc."  The Bill of Sale further states, "This transfer is effective as of July 28, 2006."  We therefore refer to it as the "2006 Bill of Sale."

## C.    The 2013 Partition Agreement

In early 2013, the Yamins executed and recorded a Partition/Stipulation Agreement ("the 2013 Partition Agreement"), declaring their "intention to inform the world of our agreement as originally set out on the [2006 Bill of Sale]," which they attached as an exhibit.  The 2013 Partition Agreement additionally partitioned everything the Yamins owned into Mary Ann's separate property, with the exception of Stephen's clothing, watches, two guns, a television, a chair, and $4,800.00 cash, which were said to be Stephen's separate property.

## D.    Conn's Suit to Collect the Judgment

A few months after the Yamins recorded the 2013 Partition Agreement, Conn sued Stephen, Mary Ann, Black Iron, and a company known as 5310 Woodway, LLC ("Woodway")[3] to collect on Conn's 2010 judgment against Stephen.  Conn alleged that Stephen fraudulently attempted to place all of the Yamins' assets beyond the reach of Stephen's creditors by claiming that all of the Yamins' assets—

---

[3] There is conflicting evidence about whether 5310 Woodway, LLC is owned by Black Iron or by Mary Ann.

4

including Stephen's alleged alter ego Black Iron—are Mary Ann's separate property. Conn sought to have the allegedly fraudulent 2006 Bill of Sale and 2013 Partition Agreement declared void under the Texas Family Code or "avoided" under TUFTA[4] and to execute on Black Iron's assets under a theory of outsider reverse-piercing of the corporate veil. The Yamins defended on the grounds of limitations and additionally maintained that the Black Iron shares are either Mary Ann's separate property or community property subject to Mary Ann's sole management, control, and disposition. They further argued that outsider reverse veil-piercing is (1) not a recognized theory in Texas; (2) unavailable where the plaintiff seeks to hold the corporation liable for the debts of a person who is not a shareholder; and (3) limited by the statute governing traditional or "direct" corporate veil-piercing, which requires a showing that the alleged fraud is related to the transaction at issue. To combat the Yamins' limitations defense, Conn asserted the discovery rule.

The jury found that Mary Ann did not acquire her Black Iron stock by way of a gift from Gina; thus, the stock did not originate as Mary Ann's separate property. The jury also found that the 2006 Bill of Sale and the 2013 Partition Agreement are fraudulent under both the Texas Family Code and TUFTA, and that Black Iron is responsible for Stephen's debt to Conn both under a common-law veil-piercing theory and under the statute governing traditional veil-piercing. *See* TEX. BUS. ORGS. CODE §§ 21.223–.225 (West 2012). Finally, the jury found that Conn should have discovered the 2006 Bill of Sale in February 2012, which was when Black Iron

---

[4] *Compare* TEX. FAM. CODE ANN. § 4.106(a) ("A provision of a partition or exchange agreement made under this subchapter is *void* with respect to the rights of a preexisting creditor whose rights are intended to be defrauded by it.") (emphasis added) *with* TEX. BUS. & COM. CODE ANN. § 24.008 ("In an action for relief against a transfer or obligation under this chapter, a creditor . . . may obtain . . . *avoidance* of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . .") (emphasis added).

produced the document to Conn's counsel. Woodway was not mentioned in the charge.

In accordance with the testimony of Conn's counsel, the jury found that the total reasonable fee for the necessary services of Conn's counsel was $215,000.00 for representation in the trial court, of which $129,000.00 was attributable solely to the veil-piercing claim. The jury assessed conditional appellate attorney's fees at $20,000.00 for an appeal to an intermediate appellate court and $50,000.00 for an appeal to the Supreme Court of Texas.

The trial court partially granted Mary Ann's, Black Iron's, and Woodway's motion to disregard jury findings, agreeing that a statute of repose bars Conn's claim that the 2006 Bill of Sale violates TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.010(a)(1). In accordance with that ruling and with the jury's remaining findings, the trial court decreed that the 2006 Bill of Sale is void (under the Texas Family Code); the 2013 Partition is void (under the Texas Family Code) and avoided (under TUFTA), and that Conn may levy execution on, and pursue other lawful post-judgment remedies against, Black Iron's stock and assets. The trial court additionally held Mary Ann and Black Iron jointly and severally liable to Conn for $215,000 in trial attorney's fees and for the conditional award of appellate attorney's fees as assessed by the jury. The trial court allowed Mary Ann's, Black Iron's, and Woodway's motion for new trial to be overruled by operation of law.

Mary Ann, Black Iron, and Woodway appealed, but only Mary Ann and Black Iron have presented issues for our review.

## II. ISSUES PRESENTED

Mary Ann argues on appeal that that the trial court erred in allowing Conn to levy execution on her Black Iron shares because the shares either are her separate

property or are community property subject to her sole management, control, and disposition. With the exception of the single jury finding that the trial court disregarded, Mary Ann challenges each of the jury's fraud findings and its finding that Conn discovered or should have discovered the 2006 Bill of Sale on February 28, 2012. She further argues that Conn neither pleaded nor proved the discovery rule. Black Iron challenges the application of outsider reverse veil-piercing that allows Conn to levy execution on Black Iron's assets, and both Mary Ann and Black Iron seek reversal of the attorney-fee award.

## III. OVERCOMING THE PRESUMPTIONS ARISING FROM THE SHARE CERTIFICATE

To understand the effect of the evidence and the jury's findings, we first explain the presumptions that apply to the characterization of property owned by one or both spouses during marriage. We then will show how the jury's findings and the conclusive evidence defeated the presumptions on which Mary Ann relies.

We begin with the initial presumption that property possessed by either spouse during the marriage is community property. TEX. FAM. CODE ANN. § 3.003(a) (West 2006). Absent a written power of attorney or a spousal agreement to the contrary, community property generally is subject to the spouses' joint management, control, and disposition. *Id.* § 3.102(c). Community property subject to the spouses' joint management, control, and disposition is subject to the liabilities incurred by a spouse before or during marriage. *Id.* § 3.202(c).

To overcome the community-property presumption, the litigant must show by clear and convincing evidence that the property at issue is a spouse's separate property. *Id.* § 3.003(b). A spouse's separate property is property that the spouse owned or claimed before marriage; property acquired by the spouse by gift, devise, or descent; and recovery for the spouse's personal injuries (other than recovery for loss of earning capacity) sustained during the marriage. *Id.* § 3.001.

7

If property is titled in one spouse's name as that spouse's separate property, then the presumption of community property is replaced with a presumption that the property is the spouse's separate property. *See Henry S. Miller Co. v. Evans*, 452 S.W.2d 426, 430–31 (Tex. 1970) (stating that there is no presumption of community property over real property in which the deed recites that it is one spouse's separate property); *In re Marriage of Brent*, No. 07-11-00223-CV, 2013 WL 683333, at *2 (Tex. App.—Amarillo Feb. 21, 2013, pet. denied) (mem. op.) (husband's promissory note reciting that the money borrowed was his wife's separate property "sufficiently rebuts the presumption of community property and creates a new presumption that the funds loaned by wife to husband were wife's separate property"); *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no writ) (recitals of separate property "displaced the normal presumption of community property, and create[d] a new presumption that the property is appellant's separate property"). Whether property belongs to the community estate or a spouse's separate estate is determined upon the inception of title. TEX. FAM. CODE ANN. § 3.006 (West 2006).

Each spouse has sole management, control, and disposition of that spouse's separate property. *Id.* § 3.101. A spouse's separate property is not subject to the other spouse's liabilities unless a rule of law makes both spouses liable. *Id.* § 3.202(a).

Certain community property, referred to as "special community property," is treated similarly to separate property. *See, e.g.*, *Montemayor v. Ortiz*, 208 S.W.3d 627, 644 (Tex. App.—Corpus Christi 2006, pets. denied). Special community property is the community property that is subject to one spouse's sole management, control, and disposition. TEX. FAM. CODE ANN. § 3.102(a); *Montemayor*, 208 S.W.3d at 643–44. Such special community property includes, among other things, a spouse's personal earnings, revenue from a spouse's separate property, and "the

increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control, and disposition." TEX. FAM. CODE ANN. § 3.102(a). Property held in the name of one spouse is presumed to be under that spouse's sole management, control, and disposition. *Id.* § 3.104(a). Unless a rule of law makes both spouses personally liable, one spouse's special community property is not subject to the other spouse's non-tortious liabilities incurred during the marriage. *See id.* § 3.202(b)(2) (West Supp. 2017).

Because the Black Iron share certificate states that the shares are owned by Mary Ann as her separate property, the presumption of community property was replaced with a presumption that the shares are Mary Ann's separate property. *See Kyles*, 832 S.W.2d at 196. To subject the shares to Stephen's contractual liability to Conn, Conn first had to overcome the presumption that the shares are Mary Ann's separate property. If Conn did so, then the shares would be community property titled in Mary Ann's name, and Conn would have to overcome the presumption that the shares were subject to Mary Ann's sole management, control, and disposition.

## A.     Defeating the Presumption of Separate Property

In the charge conference, the trial court informed the parties that the jury would not be asked whether individual assets were separate or community property, because the characterization of property is a question of law. To identify the question of fact that needed to be answered for the trial court to make this determination, Mary Ann's counsel clarified his client's position that the Black Iron shares were titled in Mary Ann's name as her separate property because the shares were "the proceeds of a gift." *See* TEX. FAM. CODE ANN. § 3.001(2) (a spouse's separate property includes property received by gift). This is the only basis on which Mary Ann claimed that the stock was her separate property *ab initio*, that is, without relying on a transfer of Stephen's community-property interest.

9

To address this issue, the jury was asked in Question 7 of the charge, "Did Mary [Ann] Yamin acquire the stock in Black Iron by way of a gift?" There initially was some confusion about the issue this question was intended to resolve. In closing, Mary Ann's counsel argued that Mary Ann acquired the stock using money received as a gift from Gina, while Conn argued that the 2006 Bill of Sale was not a gift of the stock from Stephen. This confusion was eliminated before the verdict was rendered. During deliberations, the jury asked, "May we get clarity on Question #7. We need to understand who the gift is from[,] Gina the daughter or Stephen Sr." The trial court sent back the answer, "Gina." Given the trial court's response, the question the jury answered was whether Mary Ann acquired the stock "by way of" a gift from Gina, that is, using money Mary Ann received as a gift from her daughter.

By its negative answer, the jury failed to credit Mary Ann's testimony that she acquired the stock using funds she received as a gift from Gina, or stated differently, using funds that were Mary Ann's separate property. Mary Ann does not challenge this finding on appeal. Because the jury's answer to Question 7 eliminated the only basis for Mary Ann's allegations that the shares were her separate property from their inception, the shares are presumed to be community property. *Cf. id.* §§ 3.003(a), 3.006.

## B. Defeating the Presumption of Special Community Property

Although the shares are community property, they are titled in Mary Ann's name; thus, they are presumed to be special community property under Mary Ann's sole management, control, and disposition. *See id.* § 3.104(a). Such special community property is not subject to the other spouse's contractual debts for non-necessaries. *See id.* §§ 3.201(a)(2), 3.202(b)(2). Conn therefore had to overcome the presumption that Black Iron is under Mary Ann's sole management, control, and disposition. *See Dauz v. Valdez*, No. 01-15-00831-CV, __S.W.3d__, 2018 WL

10

4129826, at *12 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, no pet.) (presumption is rebuttable).

Although the jury was not expressly asked to make such a finding, the evidence conclusively established that Mary Ann does not have sole management, control, and disposition of Black Iron. Both Stephen and Mary Ann admitted that Stephen runs the company. Stephen writes Black Iron's checks, and he not only has signature authority on Black Iron's accounts, but he also has a stamp of Mary Ann's signature that he uses at will. He and his son, not Mary Ann, maintain the company's check register. The company's books are kept on Stephen's computer, and it is Stephen who tells Black Iron's accountant how to characterize transactions. Mary Ann leaves Black Iron in Stephen's hands, for as she stated at trial, "The man that is running this company I trust with my life and my children. I have no reason to question him."

We overrule Issue 1(A). Because Black Iron is community property and is not subject to Mary Ann's sole management, control, and disposition, the shares are subject to Stephen's liability to Conn unless Stephen validly transferred his community-property interest to Mary Ann. For the reasons described in the next section, however, we conclude that the trial court correctly held the attempted transfers to be ineffective.

## IV. ATTEMPTED PROPERTY TRANSFERS

As an alternative to their attempt to establish that the shares were Mary Ann's separate property from the inception of title, the Yamins attempted to show that Stephen transferred his community-property interest in the shares to Mary Ann as her separate property. To do so, they relied on the 2006 Bill of Sale, made public as part of the 2013 Partition Agreement.

11

## A. The 2006 Bill of Sale

The 2006 Bill of Sale states that Stephen "does hereby sell, assign and transfer to [Mary Ann] as her sole and separate property, . . . [a]ll of my interest, if any, including future income and enhancements therefrom, in Texas Black Iron, Inc. . . . effective as of July 28, 2006," which is the same date that appears on the share certificate. Conn alleged that the purported transfer was fraudulent, and thus void under the Texas Family Code and avoided under TUFTA.

### 1. The Family Code Claim

In Issue 1(B), Mary Ann contends that Conn's claim that the 2006 Bill of Sale is void under the Family Code is barred by limitations because Conn failed to plead the discovery rule. She additionally argues that the evidence is legally and factually insufficient to support the jury's finding that Conn did discover, or should have discovered, the 2006 Bill of Sale on February 28, 2012. In Issue 1(C), Mary Ann asserts that the evidence is legally and factually insufficient to support the jury's finding that she or Stephen intended to defraud Conn's rights when they executed the 2006 Bill of Sale.

### (a) Limitations under the Family Code

We disagree with Mary Ann's argument that limitations bars Conn's claim that the 2006 Bill of Sale is void under Texas Family Code section 4.106. The jury was asked to determine the date on which Conn discovered, or in the exercise of reasonable diligence should have discovered, the 2006 Bill of Sale. The jury determined that date to be February 28, 2012, which according to the testimony of Conn's counsel, is the date he received a copy of the document from Black Iron.

12

### *(i)    Sufficiency of Conn's pleading*

Mary Ann contends that the trial court erred in giving effect to this finding because Conn did not raise the discovery rule in its pleading.  Again, we disagree.

Texas follows the fair-notice standard for pleading, under which the pleadings must provide the pleader's adversary "sufficient information to enable that party to prepare a defense or a response." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224–25 (Tex. 2017).  Absent special exceptions, we construe the pleadings liberally in favor of the pleader and supply every fact "that can reasonably be inferred from what is specifically stated." *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982) (quoting *Gulf, Colo. & Sante Fe Ry. Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex. 1963)).

> Conn sufficiently pleaded the discovery rule by stating in its petition,
>
> The 2006 Bill of Sale was not recorded and remained concealed from public knowledge until it was attached to an instrument entitled 'Partition/Stipulation Agreement' which was executed by [Stephen] and Mary Ann Yamin on January 29, 2013 and recorded in the Harris County Clerk's office . . . on February l, 2013. . . .

From the factual allegation that the 2006 Bill of Sale was "concealed from public knowledge" until February 1, 2013, one can reasonably infer that Conn contends it did not discover the document's existence before that date and could not have discovered it sooner through the exercise of reasonable diligence.  The pleading was sufficient to place Mary Ann on notice that the date on which Conn did learn, or could have learned, of the 2006 Bill of Sale was at issue.

### *(ii)      Sufficiency of the evidence of the discovery date*

Mary Ann next argues that the evidence is legally and factually insufficient to support the jury's finding that Conn discovered the 2006 Bill of Sale, or should have discovered it, on February 28, 2012.

At trial, Conn's counsel Barnet B. Skelton Jr. was asked if Black Iron produced a copy of the 2006 Bill of Sale on February 28, 2012. Skelton agreed that the document was produced on that date, and further testified, "That is the first time *we* had any knowledge of the bill of sale," which suggested that he was speaking on behalf of himself and his client.[5] This was confirmed when Skelton later elaborated that "this is the first time Carroll Wayne Conn or me had any knowledge of its existence." There is no evidence that Conn had actual or constructive knowledge of the 2006 Bill of Sale at any earlier date, or that it should have had such knowledge at an earlier date in the exercise of reasonable diligence.

Under the well-established standards of review applicable to legal and factual sufficiency,[6] we conclude that the evidence supports the jury's finding. We overrule Issue 1(B). The record shows that Conn filed this suit approximately eighteen months after it received the 2006 Bill of Sale, well within the four-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.051 (West 2015).[7]

---

[5] Emphasis added.

[6] *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); (legal sufficiency); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency); *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016) (factual sufficiency).

[7] Mary Ann asserts that the public filing of Black Iron's incorporation documents provided constructive notice "of the company's formation by Mary Ann Yamin." The question, however, is not when Conn should have discovered the creation of Black Iron but when it should have discovered the 2006 Bill of Sale purporting to transfer Stephen's community-property interest in the company and its income to Mary Ann's separate estate. Black Iron's certificate of formation provides no notice of the existence of the 2006 Bill of Sale, nor does Mary Ann contend otherwise.

**(b)     Sufficiency of the evidence of intent to defraud**

Under Texas Family Code section 4.106(a), "[a] provision of a partition or exchange agreement made under this subchapter [i.e., Subchapter B, "Marital Property Agreement"] is void with respect to the rights of a preexisting creditor whose rights are intended to be defrauded by it."  To address this theory, the jury was asked in Question 1 of the charge, "Did [Mary Ann or Stephen] intend to defraud the rights of [Conn] when they executed the 2006 Bill of Sale?"

The charge did not instruct the jury how to determine intent to defraud, and we have found no Texas case specifying how intent to defraud under Texas Family Code section 4.106(a) is determined; however, in a case seeking to set aside a partition agreement under both the Texas Family Code and the Texas Uniform Fraudulent Transfer Act, the Fifth Circuit reviewed the evidence of fraudulent intent under the Texas Family Code in light of the "badges of fraud" listed in TUFTA.  *See In re Hinsley*, 201 F.3d 638, 643–44 (5th Circ. 2000).  Conn challenged the 2006 Bill of Sale under both the Texas Family Code and TUFTA, and in the question addressing liability under TUFTA, the jury was instructed on the "badges of fraud" applicable to that claim.  We agree with the *Hinsley* court that when a party seeks to avoid the same transfer under both statutes, evidence that is legally and factually sufficient to establish that a transfer was fraudulent under TUFTA is sufficient to establish that the same transfer was fraudulent under the Family Code.  We do not hold that it is *necessary* that evidence of fraudulent intent be legally and factually sufficient under TUFTA for it to be legally and factually sufficient under Texas Family Code section 4.106(a); neither the Family Code nor the charge instructions relied on TUFTA factors, and jurors were not required to consider them when determining whether, under the Texas Family Code, Mary Ann and Stephen executed the 2006 Bill of Sale with intent to defraud Conn's rights as a creditor.  We

15

state only that, where a party contends that a partition agreement is fraudulent under both statutes, evidence of fraudulent intent that is *sufficient* under TUFTA also is sufficient under the Texas Family Code. Evidence that is insufficient under TUFTA may or may not be sufficient under the Texas Family Code.

In the question addressing liability under TUFTA, the jury was instructed as follows:

> In answering this question you are instructed that in determining actual intent you may consider, among other factors, whether:
> - the transfer was to an insider;
> - the transferor retained possession or control of the property transferred after the transfer;
> - the transfer was concealed;
> - before the transfer was made, the transferor had been sued or threatened with suit;
> - the transfer was of substantially all of the transferor's assets;
> - the transferor absconded;
> - the transferor removed or concealed assets;
> - the value of the consideration received was reasonably equivalent to the value of the assets transferred;
> - the transferor was insolvent or became insolvent shortly after the transfer was made[.]
>
> You are instructed that the 2006 Bill of Sale was a "transfer" as that term is used in these instructions, and that Stephen Yamin is a "transferor".
>
> You are instructed that Mary [Ann] Yamin meets the definition of an "insider."

The factors listed in this instruction are nine of the eleven "badges of fraud" listed under TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(1)–(9).[8]

---

[8] The remaining factors are whether "the transfer occurred shortly before or shortly after a substantial debt was incurred" and whether "the debtor transferred the essential assets of the

16

For the reasons previously discussed, Black Iron was community property when it was formed on July 28, 2012; thus, Stephen's purported "sale" to Mary Ann's separate estate of any community-property interest he possessed in the company was a "transfer" under TUFTA. *See* Act of May 28, 1993, 73d Leg., R.S., ch. 846, § 2, 1993 TEX. GEN. LAWS 3337, 3339 (defining "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset") (amended 2015). Moreover, the 2006 Bill of Sale expressly states that Stephen "does hereby . . . transfer to Mary Ann" any community-property interest he possessed in Black Iron and its future income and enhancements. And, as Stephen's relative, Mary Ann is an "insider" under TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.002(7)(A)(i) (defining "insider" to include an individual debtor's relatives). Thus, as to the first TUFTA factor, the 2006 Bill of Sale was a transfer to an insider.

Regarding the second factor, it is undisputed that Stephen has at all times exercised control over Black Iron. Mary Ann was unable to answer most questions about the business, frequently repeating that counsel should "ask Stephen." As for whether the 2006 Bill of Sale was concealed, the uncontroverted evidence shows that Conn first learned of the document in 2012, and that the Yamins did not record the document until 2013; thus, the evidence also supports the existence of the third factor. Turning to the remaining factors, it is undisputed that Stephen made the transfer after he had been sued by other creditors and after signing the guaranty agreement that made Conn his creditor. It also is undisputed that at the time of the transfer, Stephen was insolvent and the Yamins were being supported by their daughter. There is no evidence that Stephen owned other assets when he transferred

---

business to a lienor who transferred the assets to an insider of the debtor." TEX. BUS. & COM. CODE ANN. § 24.005(b)(10), (b)(11).

17

his interest in Black Iron, and the evidence at trial established that he received nothing in return.

Finally, the sole effect of transferring the company to Mary Ann's separate estate would have been to place Black Iron beyond the reach of Stephen's creditors. Mary Ann's testimony supports this conclusion. When asked why Stephen would "never have anything in his name" after executing the 2006 Bill of Sale, Mary Ann stated she did not know, adding that Stephen "didn't have any credit or anything, but that has nothing to do with Texas Black Iron." When it was pointed out that Mary Ann also had no credit at that time, Mary Ann stated, "I didn't have people after me. I didn't have any kind of judgments." No other rationale was offered for holding the company as Mary Ann's separate property.

We accordingly conclude that the evidence is legally sufficient to support the jury's finding that "Mary [Ann] Yamin or Stephen Yamin intended to defraud the rights of [Conn], when they executed the 2006 Bill of Sale." Because the evidence recounted above is uncontroverted, we further conclude that the evidence is factually sufficient to support the finding. Thus, we overrule Issue 1(C). We affirm the portion of the judgment decreeing, pursuant to Texas Family Code section 4.106(a), that the 2006 Bill of Sale is void and permitting Conn to levy execution on Black Iron's shares in satisfaction of Conn's 2010 judgment against Stephen.

## 2. *The TUFTA Claim*

Conn also attempted to "avoid" the 2006 Bill of Sale under TUFTA.[9] TUFTA enables a creditor to avoid a fraudulent transfer if the debtor made the transfer "with

---

[9] The finding we have just discussed under the Texas Family Code is sufficient to allow Conn to levy execution on Black Iron's shares. We nevertheless address Conn's TUFTA claim regarding the 2006 Bill of Sale because of the claim's effect on the extent to which attorney's fees are recoverable. As addressed in section VI., *infra*, attorney's fees incurred in connection with a

actual intent to hinder, delay, or defraud any creditor of the debtor. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1). The jury was asked if Stephen entered into the 2006 Bill of Sale with such fraudulent intent, and the jury answered "yes"; however, the trial court granted Mary Ann, Black Iron, and Woodway's motion to disregard this finding on the ground that Conn's TUFTA claim regarding the 2006 Bill of Sale is barred by the statute of repose.

A claim under Texas Business & Commerce Code section 24.005(a)(1) such as this is extinguished four years after the transfer, "or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." *Id.* § 24.010(a)(1). The jury found that February 28, 2012, was the date on which Conn discovered, or should have discovered in the exercise of reasonable diligence, the 2006 Bill of Sale. Because Conn did not file this suit until August 15, 2013—nearly eighteen months after Conn's counsel received a copy of the 2006 Bill of Sale—the trial court ruled that Conn's claim under TUFTA to avoid the 2006 Bill of Sale is time-barred.

Conn asserts on appeal that the 2006 Bill of Sale was a "transfer" as defined by TUFTA,[10] but that the transfer "did not 'occur' until it was recorded, as required of partition and exchange agreements under the Family Code, in 2013."[11] Although

---

TUFTA claim are recoverable; fees incurred in connection with a claim under Texas Family Code section 4.106(a) are not.

[10] *See* Act of May 28, 1993, 73d Leg., R.S., ch. 846, § 2, 1993 TEX. GEN. LAWS 3337, 3339 (amended 2015).

[11] Appellee's Br. at 10. Later in its brief, however, Conn states, "Since the Judgment found both the transactions [i.e., the 2006 Bill of Sale and the 2013 Partition] to be void under Tex. Fam. Code § 4.106(a), Appellee does not intend to challenge the trial court's ruling on the TUFTA statute of repose as to the 2006 Bill of Sale." Appellee's Br. at 21. Given Conn's inconsistent positions both challenging and denying an intent to challenge the trial court's grant of the motion to disregard the jury's finding that the 2006 Bill of Sale violated TUFTA, we address the issue from an abundance of caution.

19

we accept that the 2006 Bill of Sale is a type of partition agreement, Conn's argument rests on an incorrect premise: the Family Code does not require a partition agreement to be recorded. It permits a partition agreement to be recorded, and states that a partition agreement "is constructive notice to a good faith purchaser for value or a *creditor without actual notice* only if the instrument is acknowledged and recorded in the county in which the real property is located." TEX. FAM. CODE ANN. § 4.106(b) (emphasis added). Because Conn is Stephen's creditor and had actual notice of the document not later than February 28, 2012, when Black Iron sent a copy to Conn's counsel, the time for Conn to file a TUFTA claim regarding the 2006 Bill of Sale began to run from that date rather than from the date nearly a year later when the document was recorded as an exhibit to the 2013 Partition Agreement.

Because Conn had actual notice of the 2006 Bill of Sale more than a year before it filed this suit, the trial court correctly concluded that Conn's TUFTA claim regarding that document is barred by TUFTA's statute of repose. The trial court accordingly did not err in granting the motion to disregard the jury's finding on that issue.

## B. The 2013 Partition Agreement

In three related sub-issues, Mary Ann challenges the jury's findings regarding the fraudulent nature of the 2013 Partition Agreement. In Issue 1(D), Mary Ann argues that the 2013 Partition Agreement could not be a fraudulent transfer because it "did not alter the special community/separate property character" of Black Iron's stock. In Issue 1(E), she asserts that there is legally and factually insufficient evidence to support the jury's finding under the Family Code that when Mary Ann and Stephen executed the 2013 Partition Agreement, they intended to defraud Conn's rights as Stephen's creditor. In Issue 1(F), Mary Ann similarly challenges the jury's finding under TUFTA that the Yamins executed the 2013 Partition

20

Agreement "with the actual intent to hinder, delay or defraud Conn or any other creditor of Stephen Yamin."

### 1. The Nature of the 2013 Partition Agreement as a Transfer

In Question 4 of the charge, jurors were asked if Stephen entered into the 2013 Partition Agreement "with the actual intent to hinder, delay or defraud Conn or any other creditor of Stephen Yamin." This language tracks language of TUFTA. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1). The instructions accompanying the jury question regarding Stephen's attempt to defraud Conn under TUFTA refer only to "the transfer," not to the transfer of any particular asset, and based on that finding, the trial court rendered judgment avoiding "the purported transfer of Texas Black Iron, Inc. stock *and other property*" pursuant to the 2013 Partition Agreement.[12]

Mary Ann contends that the 2013 Partition Agreement is not a fraudulent transfer because it merely restated the terms 2006 Bill of Sale, and "[u]nless the 2006 transaction is set aside for some reason, the 2013 restatement of that transaction is immaterial." As previously explained, however, the 2006 Bill of Sale is void under the Texas Family Code; thus, the Yamins' incorporation of the same terms into the 2013 Partition Agreement is a second attempted transfer. Moreover, the 2013 Partition Agreement is much broader than the 2006 Bill of Sale. It characterizes as Mary Ann's separate property all of Black Iron's income and increases in value, as well as "all of the furniture, fixtures, jewelry, works of art, autos, boats, all checking and savings accounts, ownership of 5310 Woodway, LLC; her homestead and any and all future assets, purchased in Mary Ann's name with income derived from her assets or from Texas Black Iron"—in brief, it includes everything that the Yamins own except for the few items denoted as Stephen's separate property, which consist

---

[12] Emphasis added.

21

only of Stephen's clothes, his watches, two guns, a chair, a television, and $4,800.00 in cash. There is no evidence of any other agreement by which the Yamins attempted to convert virtually all of their community property to Mary Ann's separate property.

We overrule Issue 1(D).

## 2.    *Sufficiency of the Evidence of Intent to Defraud*

Mary Ann next contends that the evidence is legally and factually sufficient to support the jury's finding that Mary Ann or Stephen intended to defraud Conn when they executed the 2013 Partition Agreement. For the same reasons we concluded that the evidence is legally and factually sufficient to support the jury's finding that the Yamins intended to defraud Conn when they executed the 2006 Bill of Sale, we conclude that they intended to defraud Conn when they executed the 2013 Partition Agreement. Stephen was being pursued by creditors in 2006, and by 2013, his debt to Conn had been reduced to a judgment which Conn was trying to collect. Stephen and Mary Ann then tried to recharacterize nearly all of their community property as Mary Ann's separate property. The evidence previously discussed supports the jury's inference that the Yamins attempted this recharacterization to avoid Stephen's creditors. Thus, the evidence is legally sufficient to support the jury's fraud finding under TUFTA. There being no contrary evidence, the evidence also is factually sufficient.

We overrule Issues 1(E) and 1(F). Having now disposed of all of the issues raised solely by Mary Ann, we turn next to Black Iron's veil-piercing issues.

## V.  OUTSIDER REVERSE VEIL-PIERCING

Texas law presumes that a corporation is a separate entity from its officers and shareholders. *See Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997); *Wash. DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 738

22

(Tex. App.—Houston [14th Dist.] 2013, pet. denied) (en banc). Courts disregard the corporation fiction—an act generally referred to as "piercing the corporate veil"— "when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986), *superseded by statute on other grounds*, TEX. BUS. ORGS. CODE §§ 21.223– .225.

Traditionally, a court will "pierce the corporate veil" by holding a shareholder liable for the corporation's debt, effectively placing the shareholder in the shoes of the corporation. *See Willis v. Donnelly*, 199 S.W.3d 262, 271–72 (Tex. 2006). In a reverse veil-piercing case, the roles are reversed, and it is the corporation that is held liable for the shareholder's debt or otherwise substituted for the shareholder.[13]

Under a theory of outsider reverse veil-piercing, Conn contends that that it is entitled to satisfy Stephen's debt by executing on Black Iron's assets. We have recognized that reverse veil-piercing is appropriate in circumstances analogous to those that justify traditional veil-piercing. As we recently stated,

> Direct and reverse veil piercing are appropriate (1) where a corporation is organized and operated as a mere tool or business conduit of another; and (2) there is such "unity between corporation and individual that the separateness of the corporation has ceased" and holding only the corporation or individual liable would result in injustice.

---

[13] "Insider" reverse veil-piercing claims involve a "dominant shareholder or other controlling insider who attempts to have the corporate entity disregarded to avail the insider of corporate claims against third parties or to bring corporate assets under the shelter of protection from third[-]party claims that are available only for assets owned by the insider." Gregory S. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. CORP. L. 33, 37 (1990). "Outsider" reverse veil-piercing cases involve a third-party claimant who sues a corporate insider and attempts to pierce the corporate veil to subject corporate assets to the claim or who asserts the claim directly against the corporation. *Id.* As the parties before us acknowledge, the Supreme Court of Texas has not expressly addressed reverse veil-piercing, although the highest court of a number of other states and several intermediate appellate courts in this state have done so.

*Richard Nugent & CAO, Inc. v. Estate of Ellickson*, 543 S.W.3d 243, 266 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Castleberry*, 721 S.W.2d at 271, and *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454–55 (Tex. 2008)).

Conn's common-law outsider reverse veil-piercing theory was submitted to the jury in Question 5 of the charge, and the jury found Black Iron responsible for Stephen's debt under this theory. In Question 6, the jury was asked to decide Black Iron's liability for Stephen's debts in a question that borrowed language from the statute governing traditional veil-piercing, and again, the jury found Black Iron responsible. Black Iron challenges the portion of the judgment allowing Conn to execute against its assets on the grounds that (a) outsider reverse veil-piercing is bad for business and the decision whether to recognize the theory should be left to the legislature; (b) whether a corporation's assets can be reached using outsider reverse veil-piercing should be decided under the statute governing traditional veil-piercing, and the evidence is legally and factually insufficient to support the jury's answer to the statutory veil-piercing question; (c) reverse veil-piercing requires evidence of fraud that touches the transaction with the plaintiff, and there is legally and factually insufficient evidence of such fraud; and (d) reverse veil-piercing applies only to hold a corporation liable for a shareholder's debts, and there is legally and factually insufficient evidence that Stephen was a Black Iron shareholder.

A.    **Recognition of Reverse Veil-Piercing**

Black Iron first asserts that outsider reverse veil-piercing is bad for business and the decision whether to recognize the theory should be left to the legislature. It is not clear why reverse veil-piercing would be any worse for business than traditional veil piercing, for both apply only where the corporation has ceased to have a separate existence. *See id.*; *see also Rocklon, LLC v. Paris*, No. 09-16-00070-

24

CV, 2016 WL 6110911, at *4 (Tex. App.—Beaumont Oct. 20, 2016, no pet.) (mem. op.) ("Generally, basic veil-piercing alter ego principles apply to reverse-veil-piercing situations." (citing *Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 481–82 (Tex. App.—Houston [1st Dist.] 2007, no pet.))); *Wilson v. Davis*, 305 S.W.3d 57, 70 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (observing that "similar equitable principles apply to both direct- and reverse-piercing"). Black Iron cites no evidence that its concerns are present here.

Moreover, Black Iron's argument presupposes that recognition of reverse veil-piercing lies with the legislature in the first instance. But veil-piercing was created by the common law. As explained below, the legislature has now preempted the common law regarding traditional veil-piercing, but it has not addressed reverse veil-piercing, which continues to be a common-law doctrine.

We overrule Issue 2(A).

## B.    The Traditional Veil-Piercing Statute

Black Iron argues that the statute governing traditional veil-piercing applies to reverse veil piercing because the legislature added the word "or" to the statute's preemption provision in 2009,[14] so that this provision now reads,

> The liability of a holder, beneficial owner, or subscriber of shares of a corporation, or any affiliate of such a holder, owner, or subscriber *or* of the corporation, for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise.

TEX. BUS. ORGS. CODE ANN. § 21.224 (emphasis added).

To determine whether the statute applies to reverse veil-piercing as Black Iron contends, we construe the statute to give effect to the legislature's intent as expressed

---

[14] *See* Act of May 11, 2009, 81st Leg., R.S., ch. 84, § 34, 2009 TEX. GEN. LAWS 128, 138.

25

in the statute's words. *See Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). Both before and after the amendment, section 21.224 stated that "The liability . . . for an obligation that is limited by Section 21.223 is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." Thus, under the statute's plain language, only liability that is limited by Section 21.223 is preempted.

Section 21.223 limits liability "*to the corporation or its obligees*" regarding "the shares," "any contractual obligation of the corporation or any matter relating to or arising from the obligation," and "any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality." *Id.* § 21.223(a) (emphasis added). In this case, no one seeks to hold anyone liable to Black Iron or to Black Iron's obligees. Because no limitation of liability under section 21.223 is at issue, section 21.224 is inapplicable.

We overrule Issue 2(B). As a matter of law, the traditional veil-piercing statute does not apply to Conn's claim; thus, the jury's answer to Question 6 is immaterial.

## C.      Fraud Related to the Transaction at Issue

Again relying on the statute applicable to traditional veil-piercing claims, Black Iron argues in Issue 2(C) that reverse veil-piercing applies only where there is evidence of fraud that in some way touches a transaction with the plaintiff. *See id.* § 21.223(b) (stating that the statute's limitation of liability is inapplicable "if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate"). Black Iron states there is no such evidence because Black Iron engaged in no communications or transactions with Conn.

26

In light of our conclusion that the statute on which Black Iron relies is inapplicable to Conn's claims, we overrule Issue 2(C).

## D. Reverse Veil-Piercing as Applied to the Debts of a Non-Shareholder

In Black Iron's last issue on this subject, it contends that a finding that a corporation is an individual's alter ego cannot rest solely on evidence that the individual is a corporate officer, and there must instead be evidence that the individual is a shareholder. We agree that evidence that a person is a corporate officer is not, without more, sufficient to support a finding of alter ego, but that is not the case before us. There is a great deal of evidence that "Black Iron was organized and operated as a mere tool or business conduit of Stephen Yamin," as the jury found by its finding that Black iron is responsible for Stephen's debt to Conn under the common-law theory of outsider reverse veil-piercing.

We disagree, however, with Black Iron's contention that outsider reverse veil-piercing is inapplicable here simply because the shares are held in Mary Ann's name. As previously discussed, Black Iron is community property subject to Stephen's joint management, control, and disposition. Stephen and Mary Ann are therefore equal owners of undivided interests in the shares. *See Farmers Tex. Cty. Mut. Ins. Co. v. Okelberry*, 525 S.W.3d 786, 794 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("The community property scheme thus makes the spouses equal owners of undivided interests in all of the community property."). That being the case, we overrule Issue 2(D). We accordingly do not consider whether outsider reverse veil-piercing would be available to a creditor of a corporate officer lacking such an ownership interest. We affirm the portion of the judgment concerning piercing of Black Iron's corporate veil, and we turn now to Mary Ann's and Black Iron's joint challenges to the trial court's award of attorney's fees.

27

## VI. ATTORNEY'S FEES

Mary Ann and Black Iron jointly challenge Conn's attorney-fee award on the grounds that (a) they should not be held jointly and severally liable for the fees, (b) there is no statutory authority for the award of attorney's fees for Conn's claims under the Texas Family Code, (c) there is no statutory authority for an award of attorney's fees for outsider reverse-piercing of the corporate veil, and (d) Conn failed to adequately segregate recoverable from non-recoverable fees.[15]

Attorney's fees are recoverable only as provided by statute or by a contract between the parties. *Willacy Cty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 52 (Tex. 2018). As the basis for an award of attorney's fees, Conn relies solely on TUFTA's provision, "In any proceeding under this chapter, the court may award costs and reasonable attorney's fees as are equitable and just." TEX. BUS. & COM. CODE ANN. § 24.013. We review an award of attorney's fees under this provision for abuse of discretion. *See Jones v. Dyna Drill Techs., LLC*, No. 01-16-01008-CV, 2018 WL 4016413, at *10 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

### A. Joint and Several Liability

Mary Ann and Black Iron first contend that the trial court abused its discretion in holding them jointly and severally liable for attorney's fees. We agree. Conn relied solely on TUFTA in seeking attorney's fees, but Conn did not assert a TUFTA claim against Black Iron. Conn's only "claim" against Black Iron was the assertion

---

[15] Because Mary Ann and Black Iron did not assign a letter to their first argument, the arguments are labeled in their brief as 3, 3(A), 3(B), and 3(C). For consistency, we have assigned a letter to each argument.

of the right to levy execution on Black Iron's assets under a theory of outsider reverse veil-piercing. As a common-law theory, outsider reverse-veil piercing does not support an award of attorney's fees. *See Sebastian Cotton & Grain*, 555 S.W.3d at 52.

We sustain Issues 3(A) and 3(C), and we hold that Black Iron is not liable for Conn's attorney's fees.

## B.    Claims Under the Texas Family Code

Mary Ann and Black Iron next argue that the Texas Family Code does not authorize an award of attorney's fees in an action to declare a marital-property agreement void. *See* TEX. FAM. CODE ANN. § 4.106. Again, we agree, and Conn does not contend otherwise.

We sustain Issue 3(B).

## C.    Failure to Adequately Segregate

Finally, Mary Ann and Black Iron maintain that Conn failed to adequately segregate recoverable from non-recoverable fees, and thus, the jury's findings regarding reasonable fees for the necessary services of its attorneys at trial and on appeal is unsupported by legally and factually sufficient evidence. The extent to which fees for legal services are capable of segregation is a mixed question of law and fact. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312–13 (Tex. 2006); *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The party seeking to recover its fees bears the burden to show that segregation is not required. *Clearview Props., L.P. v. Prop. Tex. SC One Corp.*, 287 S.W.3d 132, 144 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Conn argues that all of its attorney's fees are recoverable because "[t]he facts supporting avoidance of both the 2006 Bill of Sale and the 2013 Partition/Stipulation

29

Agreement are identical and, by definition, intertwined." But the test is not whether the facts are intertwined. "Intertwined facts do not make tort fees recoverable; it is only when *discrete legal services* advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14 (emphasis added). Conn did not segregate all of its non-recoverable fees from recoverable fees as required. Although Conn's counsel did testify that $129,000.00 of the $215,000.00 billed to Conn for trial attorney's fees were attributable solely to Conn's veil-piercing claim, the remaining $86,000.00 includes fees that Conn cannot recover from Mary Ann, such as fees incurred for discrete legal services performed on claims for which fee recovery is not authorized, fees for pursuing relief that Conn did not obtain,[16] and fees for work on Conn's claims against Woodway.

Conn argues that its attorney's fees for pursuing outsider reverse veil-piercing are recoverable because TUFTA provides that, "[i]n an action for relief against a transfer or obligation . . . , a creditor . . . may obtain . . . subject to the applicable principles of equity and in accordance with the rules of civil procedure . . . any other relief the circumstances may require." TEX. BUS. & COM. CODE ANN. § 24.008(a)(3). But as mentioned above, Conn obtained veil-piercing relief against Black Iron, and Conn asserted no TUFTA claims against that party.

Because fees for some discrete tasks were recoverable and fees for other discrete tasks were not, Conn was required to segregate its attorney's fees but failed to adequately do so. The only attorneys' fees that are eligible for recovery are (1) fees incurred for discrete legal work on a TUFTA claim, and (2) fees incurred

---

[16] These include, *inter alia*, Conn's unsuccessful request for turnover relief. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 31.002 (West 2015) (turnover statute); *Boudreaux Civic Ass'n v. Cox*, 882 S.W.2d 543, 550 (Tex. App.—Houston [1st Dist.] 1994, no writ) (fees are recoverable under the turnover statute only if the judgment creditor obtains turnover relief).

for discrete legal services that advance both a recoverable and an unrecoverable claim. *See Chapa*, 212 S.W.3d at 313–14. So, for example, Conn cannot recover fees, even if nominal, for researching and drafting those parts of its pleadings, motions, discovery, briefs, responses, or proposed orders and jury charges that pertain only to claims for which fees are not recoverable. *See, e.g.*, *id.*; *Home Comfortable Supplies, Inc. v. Cooper*, 544 S.W.3d 899, 911 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (reversing award of attorney's fees that allegedly could not be segregated because they were "reasonably related to or were intertwined with services rendered [on successful claims for which fees were recoverable]" and instead pointing out that "[f]orty of the forty-two questions in the proposed charge concern claims against defendants against whom [the appellees] did not prevail, or to causes of action on which they did not prevail, or claims by plaintiffs who did not prevail") (footnotes omitted); *CA Partners v. Spears*, 274 S.W.3d 51, 84 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (segregation required where claims for which fees were not recoverable required "drafting separate portions of [the appellee's] pleading," "separate legal research," and "possibly separate discovery requests"); *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 509–10 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (op. on reh'g) (fees not recoverable for drafting a paragraph of the petition asserting a claim for which fees are not recoverable, or for drafting two charge questions related to that claim).[17]

---

[17] In noting that fees incurred on a TUFTA claim are *eligible* for recovery, we do not hold that Conn is *entitled* to recover attorney's fees incurred for work on its successful 2013 TUFTA claim or its time-barred 2006 TUFTA claim; rather, Conn will bear the burden on remand to establish that, as to each of these claims, the attorney's fees incurred were reasonable, and that it is equitable and just for the trial court to award them. *See* TEX. BUS. & COM. CODE ANN. § 24.013.

We therefore sustain Issue 3(D), reverse this part of the judgment, and remand the cause for the limited purpose of relitigating the issue of attorney's fees.

## VII. CONCLUSION

For the foregoing reasons, we (a) reverse the award of attorney's fees, (b) affirm the remainder of the judgment, and (c) remand the cause for a new trial solely on the issue of attorney's fees.

/s/    Tracy Christopher
Justice

Panel consists of Chief Justice Frost and Justices Christopher and Jamison (Frost, C.J., concurring and dissenting).