**Motion for Rehearing Overruled, Opinion of November 17, 2020 Withdrawn, Affirmed in Part, Reversed and Remanded in Part, and Substitute Opinion filed March 18, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00450-CV

### SOUHAIL ADAM, Appellant/Cross-Appellee

### V.

### JAVIER MARCOS, JR. AND LAW OFFICES OF MARCOS & ASSOCIATES, P.C., Appellees/Cross-Appellants

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2014-21616**

## S U B S T I T U T E   O P I N I O N

We issued our original opinion in this case on November 17, 2020. Appellant/Cross-Appellee filed a motion for rehearing. We overrule the motion for rehearing, withdraw our previous opinion, and issue this substitute opinion.

These cross appeals stem from a dispute over an alleged partnership

agreement between a lawyer and his client. Attorney Javier Marcos, Jr. and his law firm, the Law Offices of Marcos & Associates, P.C., sued Souhail Adam and entities in which Adam had an ownership interest, alleging Marcos and Adam had agreed to enter a 50/50 partnership to own and operate future joint ventures. Marcos's claims included breach of the partnership agreement, breach of fiduciary duties, fraud, and quantum meruit for unpaid legal services, among others. Adam counterclaimed for defamation, among other things, and asserted Marcos had breached his fiduciary duties to Adam.

At the close of evidence, the trial court granted directed verdicts against Marcos on his breach of fiduciary duty and fraud claims and against Marcos's law firm on all claims. The court also entered directed verdicts in favor of the entities in which Adam had an ownership interest on all claims. The jury then found that Marcos and Adam entered a partnership regarding two business entities, Adam failed to comply with the partnership agreement, and Marcos thereby suffered damages of $891,500. The jury found, however, that Marcos failed to comply with his fiduciary duties to Adam, although no damages question was asked about this failure to comply. The jury additionally found that Marcos performed compensable work for Adam for which he was not paid, but the jury assessed the value of the uncompensated work at "$0." The jury also found that Marcos incurred reasonable and necessary attorney's fees of $590,270 in prosecuting his claims. The jury determined that Marcos did not defame Adam.

After post-trial briefing, the trial court disregarded the jury's findings that Adam breached the partnership agreement and the value of Marcos's unpaid legal services was $0, and it entered a judgment notwithstanding the verdict (JNOV) favoring Marcos on his quantum meruit claim in the amount of $405,000. The court also awarded Marcos attorney's fees of $590,000.

2

Adam raises three issues in this appeal. In his first two issues, he contends the trial court erred in awarding Marcos quantum meruit damages because at least some evidence supports the jury's finding of $0 in damages and the evidence does not conclusively establish damages of $405,000. In his third issue, Adam asserts the trial court erred in permitting Marcos to put on evidence of his attorney's fees because he failed to properly disclose information during discovery and in awarding Marcos attorney's fees of $590,000 because that amount does not bear a reasonable relationship to the damages awarded.

In a conditional cross-appeal, Marcos also raises three issues, asserting that the trial court erred in (1) directing a verdict on Marcos's breach of fiduciary duty and fraud claims, (2) disregarding the jury's finding that Adam breached the partnership agreement, and (3) considering the fee agreement between Marcos and his trial counsel in determining the amount of quantum meruit damages. Although Marcos's law firm is listed as a party in the notice of cross-appeal, no issues or arguments are raised pertaining to the law firm.

Concluding that the evidence was sufficient to establish some quantum meruit damages but not the amount awarded by the trial court and that the trial court erred in directing a verdict against Marcos's fraud claims, we reverse and remand for a new trial on the quantum meruit and fraud claims. We affirm the remainder of the judgment.

### *Background*

Adam owns and operates several small businesses in the Houston area. Marcos owns his own small law firm. Marcos worked as the primary attorney representing Adam and his businesses for several years, and the men became close friends. Beyond those facts, Marcos and Adam presented largely contradictory views at trial of their business relationship. Marcos asserted that at one point, he

3

and Adam entered a partnership agreement to split profits from future joint ventures evenly. Adam asserted that Marcos merely gave him funds to invest in Adam's businesses as Adam saw fit to make a return for Marcos on his investment. Adam insists that there was no agreement under which Marcos was to have an ownership interest in any of the businesses.

**Marcos's position.** According to Marcos, in 2006, after he and his law firm had been performing legal services for Adam and several of his businesses for several years, he and Adam agreed to form a partnership on future joint ventures, sharing costs and profits evenly. The pair would agree on what future joint ventures to undertake, Marcos would be in charge of all legal matters, and Adam would run day-to-day operations. They purportedly sealed the agreement with a celebratory "fist bump," but no agreement was ever reduced to writing. Marcos said that at Adam's request, Marcos would be a "silent" partner, with his name left off the formational documents for any joint venture entity they created.

Marcos also explained that he and Adam had become close friends by that point and even though Adam had previously rejected the idea of partnering with Marcos, he agreed in 2006 because his legal needs had increased as his businesses had expanded. To support the partnership, Marcos said that he agreed to provide legal services free of charge—at first just for the joint ventures but ultimately for all the entities in which Adam had an interest. For this reason, Marcos says that he did not bill or invoice Adam or his companies from sometime in 2006 until the relationship fell apart in 2014, despite providing thousands of hours in legal services.

Marcos also asserted that he provided an initial $250,000 to fund the first joint venture, Metro Vehicle Storage, LP, a vehicle towing and impound storage lot. Marcos borrowed money from his bank and presented Adam with two checks,

4

each for $100,000, plus an additional $50,000 in cash. Meanwhile, Adam also provided cash for the venture and personally guaranteed a loan of $1 million. According to Marcos, all profits from the joint ventures were initially to be used to pay down this note, so it was understood that there would be no partnership distributions for an extended period. Other entities the partnership allegedly formed or purchased as joint ventures included Athena Investments, L.P., EBF Auto, Inc., and McKaskle Industrial Complex, Inc. At trial, Marcos claimed a 50 percent interest in each of these businesses.

Marcos testified that Adam did not correct Marcos or Marcos's wife when they referred to Marcos and Adam on several occasions as business partners. Marcos's wife also testified that Adam told her that he and Marcos were partners. By late 2013, however, Marcos began having concerns about the partnership's finances, the lack of distributions, and the remaining balance on the initial note, and he asked Adam for access to financial records. According to Marcos, Adam was initially evasive but ultimately told Marcos he did not want to be partners any longer. Marcos said that he later learned Adam had been taking profits from the joint ventures and not using them to pay down the note as agreed. Marcos then brought the current lawsuit.

As part of his evidence, Marcos prepared and presented a spreadsheet and an affidavit that sought to recreate hours Marcos spent providing legal services to Adam and his businesses that were never billed or invoiced. Marcos asserted that the unpaid fees amounted over $1.8 million dollars. An attorney's fees expert supported Marcos's conclusion but expressly stated that he did not undertake a quantum meruit determination of the allegedly unpaid legal services. Marcos also testified that he had paid certain legal expenses and fees for Adam and his businesses which had not been reimbursed. Marcos acknowledged, however, that

Adam had paid him $230,000 before trial as a reimbursement for the money Marcos had initially contributed to the purported Metro joint venture.

**Adam's position.** According to Adam, he consistently rejected Marcos's suggestion that the two of them enter a partnership together and the alleged fist bump deal never happened. Instead, Adam explained that Marcos gave him the two $100,000 checks plus an additional $30,000 in cash for Adam to invest in his businesses as he saw fit to provide a return for Marcos on his money. Adam emphasizes that none of the formational documents of the alleged joint ventures—documents that Marcos himself drafted—list Marcos as a member, partner, or shareholder. Adam also points out that Marcos failed to reveal his alleged ownership interest in several legal contexts where such recognition would have been required or expected, including when he represented the entities in hearings before the Texas Department of Licensing Regulations (TDLR). Adam also signed loan guarantees for the entities, Marcos did not, partnership K1 forms for the entities showing taxable income did not list Marcos as a party, and Marcos did not report any income for the entities or the alleged partnership on his tax returns, but Adam did. Adam also insisted that he paid Marcos $85,000 in cash over the years as earnings on the investment and returned all the $230,000 Marcos gave him before trial.

Regarding the legal services Marcos provided from 2006 until 2014, Adam minimized the amount of work actually performed and indicated that he had performed services in exchange for Marcos, including automobile repairs after two wrecks. Adam also asserted he had paid Marcos back for legal expenses. Adam's expert on attorney's fees excoriated Marcos's spreadsheet, affidavit, and testimony on fees, arguing that the evidence was so unbelievable and unreliable as to amount to no evidence of fees. The expert concluded that there may be some value there,

for quantum meruit purposes, but he could not tell what it was.

**Procedural history.** As stated above, Marcos raised claims both on behalf of himself and his law firm against both Adam and Adam's businesses. Marcos's claims included breach of the partnership agreement, breach of fiduciary duties, fraud, quantum meruit, knowing participation in a breach of fiduciary duty, conspiracy, minority shareholder oppression, money had and received, joint enterprise, agency, and alter ego. Adam cross-claimed for defamation among other things and asserted Marcos had breached his fiduciary duties to Adam. At the end of trial, the trial court determined that Marcos had abandoned his money had and received and joint enterprise claims, and the court granted directed verdicts on all of Marcos's remaining individual claims except breach of the partnership agreement and quantum meruit against Adam, on all claims by Marcos's law firm, and on all claims against Adam's businesses.[1] The case then went to the jury on Marcos's breach of the partnership agreement and quantum meruit claims and on Adam's defamation claim. The jury was also asked whether Marcos had complied with his fiduciary duties to Adam, but this appears to have been a defensive issue for Adam and not an affirmative claim for damages.

The jury made the following findings:

- Marcos and Adam entered a partnership regarding two business entities, Metro and EBF, but not two others, McKaskle and Athena.

- Adam failed to comply with the partnership agreement, and Marcos thereby suffered damages of $891,500, comprised of 50 percent of the value of Metro and EBF.

- Marcos failed to comply with his fiduciary duties to Adam.

- Marcos performed compensable work for Adam for which he was not paid, but the value of the uncompensated work was $0.

---

[1] The trial court also granted a directed verdict against Adam's claim for fraud.

7

- Marcos incurred reasonable and necessary attorney's fees in prosecuting his claim of $590,270.

- Marcos did not defame Adam.

After extensive post-trial briefing, the trial court determined that Marcos had failed to establish that the alleged partnership agreement was fair and reasonable (as required for an attorney/fiduciary who has contracted with his client/beneficiary), and thus the trial court disregarded the jury's breach of the partnership findings. The court further held that the jury's answer to the question on the value of the unpaid legal services Marcos had provided ("$0") went "against the great weight and preponderance of the evidence" and was "not supported by any evidence." And the court held that Marcos had proven his quantum meruit damages as a matter of law to be $405,000. The court therefore entered a JNOV favoring Marcos on the quantum meruit claim for $405,000 in damages and attorney's fees of $590,000 along with additional amounts in the event of an appeal.

## *Overview of Appellate Issues*

We will begin by addressing Adam's first two issues, which challenge the trial court's disregarding of the jury's $0 finding on quantum meruit damages and entry of a JNOV of $405,000 on that claim. Marcos insists that the trial court acted properly because there was a fatal conflict between the jury's findings that Marcos performed compensable work for which he was not paid but the value of the uncompensated work was $0. However, the remedy for a conflict in the jury's answers would have been to instruct the jury and send them back for further deliberations to attempt to resolve the conflict. On the merits, the trial court correctly determined that evidence established as a matter of law that Marcos suffered some quantum meruit damages, but the evidence did not establish the

8

amount of those damages as a matter of law. We will therefore reverse the part of the judgment pertaining to quantum meruit and remand for a new trial on that claim. We sustain in part Adam's first two issues.

We then turn to Marcos's conditional cross-issues. In his second issue, Marcos asserts the trial court erred in determining that the partnership agreement was unenforceable and thus disregarding the jury's breach of contract findings. But Marcos failed to obtain a finding that the agreement was fair and reasonable, and, in fact, the jury held he breached his fiduciary duty to Adam in relation to the agreement. Because the trial court therefore correctly ruled that the partnership agreement was invalid, we overrule Marcos's second issue. In his first issue, Marcos contends that the trial court erred in granting directed verdicts against his breach of fiduciary duty and fraud claims because there was sufficient evidence to support submitting those claims to the jury. We overrule Marcos's first issue in regards to the fiduciary duty claim and sustain it in regards to the fraud claim. In the absence of an enforceable partnership agreement, Adam did not owe a fiduciary duty to Marcos that he could have breached. However, evidence supported submitting Marcos's fraud claim to the jury. Because of our resolution of these other issues, we need not address either parties' third issue, as those issues concern the trial court's award of damages and attorney's fees to Marcos. We also reverse and remand the portion of the trial court's judgment awarding attorney's fees to Marcos.

### *Discussion*

### I. Quantum Meruit

In his first two issues, Adam contends the trial court erred in awarding Marcos quantum meruit damages because at least some evidence supports the jury's finding of $0 in damages and the evidence does not conclusively establish

9

damages of $405,000. Question 4 of the jury charge asked:

> Did Marcos perform compensable work for Souhail Adam for which Marcos was not paid?
>
> Marcos performed compensable work if he rendered valuable services to Souhail Adam; Souhail Adam accepted, used, and benefitted from the services; and, under the circumstances, Souhail Adam was reasonably notified that Javier Marcos expected to be compensated for the services.

The jury answered the question, "Yes." Question 5 was tied to a positive answer to Question 4 and asked, "What is the reasonable value of such compensable, but uncompensated work at the time and place it was performed? Answer in dollars and cents, if any." The jury answered this question, "$0."

As discussed, the trial court disregarded the jury's $0 damages finding and awarded Marcos a JNOV for $405,000 in quantum meruit damages. We will first address Marcos's contention that the two jury answers fatally conflicted and then turn to the sufficiency of the evidence to support the $0 damages finding.

## A. Marcos Alleges a Fatal Conflict

During post-trial proceedings, after the jury was dismissed, Marcos's counsel suggested to the trial court that there was a conflict between the jury's answers to questions 4 and 5. Specifically, counsel argued that because the jury answered "yes" to whether Marcos performed compensable work for which he was not paid, the jury's $0 answer as to the value of uncompensated work made no sense. The trial court did not rule on any alleged conflict in the jury answers but determined that the $0 response to Question 5 was "against the great weight and preponderance of the evidence" and "not supported by any evidence." The court then entered a JNOV favoring Marcos and awarding $405,000 as quantum meruit

damages.[2]

On appeal, Marcos reiterates his position, arguing that there was a fatal conflict in the answers. The remedy for a fatal conflict in jury answers, however, is for the trial court to inform the jury of the nature of the conflict, provide additional instructions as may be proper, and retire the jury for further deliberations. *See* Tex. R. Civ. P. 295; *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 518 (Tex. 2018) (plurality opinion); *Meek v. Onstad*, 430 S.W.3d 601, 605 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Marcos waived any right to that remedy by not raising the issue in the trial court before the jury was dismissed. *See Menchaca*, 545 S.W.3d at 518; *Meek*, 430 S.W.3d at 605. Moreover, the trial court did not hold that the answers were in fatal conflict or grant a new trial on that basis but instead held that the $0 damages finding was unsupported by legally or factually sufficient evidence and granted a JNOV for a specific amount of damages.[3]

## B. Governing Law

We review the propriety of a trial court's grant of JNOV under a legal sufficiency standard. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Collins v. D.R. Horton-Tex. Ltd.*, 574 S.W.3d 39, 46 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). When examining a legal sufficiency challenge, we review the evidence in the light most favorable to the

---

[2] The trial judge certainly noted the seemingly incongruous answers to questions 4 and 5, calling the answer to Question 5 "odd" in light of the answer to Question 4, but he did not rule on or attempt to remedy the alleged fatal conflict.

[3] Generally, when presented with a possible fatal conflict in jury answers, our first duty is to reconcile the answers if reasonably possible. *See Menchaca*, 545 S.W.3d at 509; *Jabri v. Alsayyed*, 145 S.W.3d 660, 668 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We need not address in this case whether there was a conflict in the answers because the trial court did not make such a ruling and Marcos did not preserve the issue below. *See Cressman Tubular Prods. Corp. v. Kurt Wiseman Oil & Gas, Ltd.*, 322 S.W.3d 453, 462 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

disregarded jury finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Tanner*, 289 S.W.3d at 830. We uphold the jury's finding if more than a scintilla of competent evidence supports it. *Id*. Generally, the evidence is legally insufficient to support a finding and a JNOV must be granted when the record demonstrates: (1) the complete absence of evidence on a vital fact; (2) a rule of law or evidence precluded according weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact amounted to no more than a scintilla; or (4) the evidence conclusively established the opposite of a vital fact. *E.g.*, *Advanced Gas & Equip., Inc. v. Airgas USA, LLC*, No. 14-16-00464-CV, 2017 WL 3442430, at *3 (Tex. App.—Houston [14th Dist.] Aug. 10, 2017, pet. denied) (mem. op.); *see also City of Keller*, 168 S.W.3d. at 810-11 (discussing what evidence to consider in reviewing legal sufficiency). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827. We review de novo a trial court's ruling on a motion for JNOV. *Abel v. Alexander Oil Co.*, 474 S.W.3d 795, 799 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

A party with the burden of proof at trial is entitled to JNOV on a particular issue only if the evidence establishes that issue in their favor as a matter of law. *E.g., Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Because Marcos had the burden to prove his damages, he was required to prove his right to damages as a matter of law to be entitled to a JNOV on that issue. *See Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 234–35 (Tex. 2019); *Tanner*, 289 S.W.3d at 830; *Paz v. Molina*, No. 14-11-

12

00664-CV, 2012 WL 2466578, at \*2 (Tex. App.—Houston [14th Dist.] June 28, 2012, no pet.) (mem. op.).

In conducting this analysis, we separate the fact of injury or damages from the amount of damages; in other words, "we must distinguish 'uncertainty as to the fact of damages' from 'uncertainty merely as to the amount of damages.'" *Lufkin Indus.,* 573 S.W.3d at 235 (quoting *McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 207 (Tex. 1985)). "Uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." *McKnight*, 689 S.W.2d at 207 (citing *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938)); *Allstate Ins. Co. v. Rehab All. of Tex., Inc.*, No. 14-13-00459-CV, 2015 WL 1843249, at \*7 (Tex. App.—Houston [14th Dist.] Apr. 21, 2015, pet. denied) (mem. op.); *see also Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016) ("[A]n overstatement of damages does not entirely defeat recovery when there is legally sufficient evidence that damages exist."). Because we conclude that Marcos conclusively established that he suffered some injury or damages but not in the amount awarded by the trial court, we reverse and remand for a new trial on the quantum meruit claim. *See Lufkin Indus.,* 573 S.W.3d at 236.

### C. The Evidence on Quantum Meruit

### 1. Marcos's evidence

Marcos's evidence about the value of the legal services he provided to Adam and the businesses Adam owned came primarily from a spreadsheet and an affidavit Marcos prepared, Marcos's own testimony, and the testimony of his expert, Daniel Hedges. Marcos said that he did not bill Adam for any legal work after they agreed to form a partnership until the time they parted ways despite having provided thousands of hours of services over that period of time. As

13

Marcos explained, in creating the lengthy spreadsheet, he was attempting to quantify the time he spent from 2006 to 2014 on legal matters for Adam and his businesses and describe the services provided. He said he did this by combing through all the files that he had pertaining to legal matters for Adam and the businesses. Marcos acknowledged some difficulties in doing so, as he had not kept contemporaneous track of activity or time spent. The spreadsheet contained entries for over 1800 tasks and totaled 3,424 hours of legal services.

In the affidavit Marcos provided, he explained that he was unable to fairly capture certain types of legal work in the spreadsheet because this work was not accurately reflected in the files that he had reviewed for the spreadsheet. This work included: time worked by paralegals and staff attorneys, time spent reading and responding to emails where a copy was not printed and placed in the files, and time spent meeting with Adam, among other things. In total, including amounts from the spreadsheet and the affidavit, Marcos asserted that he and his firm spent 7,544.84 hours providing legal services for Adam and his businesses from 2006 to 2014 that went unpaid. On that basis, he requested the jury award damages of over $1.8 million in response to Question no. 5.[4]

Hedges, Marcos's legal fees expert, expressly stated that he was not offering an opinion on the value of Marcos's services in a quantum meruit context and that doing so would require a different analysis than Hedges performed. He explained that his task was to determine what a reasonable billable rate would be for the services performed and to review the hours Marcos was representing as worked. Hedges said that the work in question required a certain amount of skill but not a particularly high level and that none of the matters were particularly large but had

---

[4] Marcos also asserted that he had paid fines and fees and other items for Adam and his businesses that had not been reimbursed. Marcos does not, however, explain how making a payment on behalf of another constituted "uncompensated work" in the context of Question 5.

added up over time. Hedges allowed that he was "satisfied to some extent" with Marcos's efforts to account for the work and that Marcos "made a good faith effort to come up with numbers" but those numbers "would never have the degree of reliability of something that was entered contemporaneously on a timesheet." Hedges recommended discounting the hours on the spreadsheet by 10 percent to account for the uncertainty and discounting the numbers in the affidavit by 15 percent. Hedges did not perform his own analysis of the work performed by going through Marcos's files. Nonetheless, Hedges concluded that an award of over $1.8 million would be reasonable for the services Marcos said he provided.

## 2. Adam's evidence

Adam's evidence pertaining to the quantum meruit claim consisted primarily of his own testimony as well as that of his legal expert, Daryl Bristow. In his testimony, Adam acknowledged that Marcos had been providing legal services but not sending bills or invoices. Adam further agreed that Marcos's services were of value to Adam and Adam's businesses. But Adam also insisted that he and Marcos had a bartering arrangement under which each would perform services for the other free of charge.[5] According to Adam, while Marcos performed unpaid legal work, Adam or his businesses also did work for Marcos on his car, including significant body work after a couple of accidents.[6] Adam further minimized the type and amount of work Marcos did, asserting the matters Marcos handled were typically simple and routine like TDLR violations and small lawsuits in justice of the peace courts. Adam denied that his legal fees were "ramping up" in 2006 as Marcos had claimed and pointed out that the legal fees he incurred both before and

---

[5] The jury, of course, found that Marcos and Adam had a partnership agreement, not a bartering agreement.

[6] It was uncontested that one of Adam's businesses received insurance payments that covered a large portion of the accident repairs.

after the seven-year period in which Marcos did not send bills were a fraction of what Marcos was claiming for that period. Adam also criticized the time Marcos reported working on three cases that were referred to as "the big three" during trial since they comprised a large share of the hours claimed.

Bristow, Adam's expert on legal fees, insisted that Marcos's spreadsheet, affidavit, and testimony were so unbelievable and unreliable as to amount to no evidence of fees. He discounted Hedges' testimony because Hedges did not look beyond Marcos's spreadsheet and affidavit to the actual work files. Bristow criticized the amounts Marcos listed for certain cases as grossly out of proportion to the size of the case. For example, the plaintiff in one case sought $900 against one of Adam's businesses, but Marcos sought over $200,000 in fees for handling that case. Bristow explained that another case was frivolous and nonsuited but Marcos still requested $22,000 for his representation. In another, the plaintiff was awarded attorney's fees of $8,400 but Marcos sought $31,750, and in another, Marcos sought $42,500 on a case in which only $2,000 was at stake. In the case for which Marcos reported the most time spent, the *Johnson* case, Bristow pointed out that Marcos reported to the judge his fees were only $8,000, well below the $350,000 Marcos requested at trial for work done on that case. For another case, Marcos sought to charge Adam for work when another party had indemnified Adam and already paid Marcos a flat fee. In another, Marcos had agreed to represent Adam's girlfriend for free but then sought to charge Adam.

Bristow also pointed out instances in the spreadsheet and affidavit that he asserted showed double-billing, over-billing for simple clerical tasks, and rates that were too high for the type of work performed. Bristow noted 70 entries on the spreadsheet for "receiving a notice of a setting or event and placing it on the calendar," for most of which, Marcos listed an hour of work per occurrence.

16

Bristow highlighted 3,000 hours in block billing that was not broken down by task, project, or client. Bristow viewed with suspicion that along with his other cases for other clients, Marcos appeared to be billing around 3,200 to 3,300 hours a year, which Bristow said would be very rare for a lawyer. Bristow concluded that Marcos had the burden to demonstrate the value of his services but his evidence was so lacking in credibility that the jury had no basis on which it could make that determination.

Another critique raised by Bristow in particular, and at several other points during trial, concerns the fact that Marcos's spreadsheet and affidavit were largely devoid of indications for which client the listed tasks were performed. Nevertheless, it appears likely from the testimony and evidence that most of the work was performed for the business entities and not Adam individually. When case names are provided in the spreadsheet, they commonly include one of the business entities as a party but not Adam. Moreover, from the description of the tasks performed, the matters appear to relate to the businesses and not Adam in his individual capacity. Likewise, the affidavit does not specify the clients for which the work was done but instead refers generally, repeatedly, and somewhat ambiguously to work done for "Defendants."

Texas law starts with a presumption that an individual and a business entity are separate legal persons, and the burden of proving otherwise is on the party seeking to pierce that corporate veil. *See Durham v. Accardi*, 587 S.W.3d 179, 185 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *Kochar v. Wasserman*, No. 04-18-00901-CV, 2019 WL 3307915, at *2 (Tex. App.—San Antonio July 24, 2019, no pet.) (mem. op.); *Yamin v. Carroll Wayne Conn, L.P.*, 574 S.W.3d 50, 66 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Courts will not disregard the corporate veil absent exceptional circumstances. *Lucas v. Tex. Indus., Inc.*, 696

17

S.W.2d 372, 374 (Tex. 1984); *Durham*, 587 S.W.3d at 185. While Marcos pleaded claims against several of the individual businesses and pleaded claims that sought to pierce the corporate veil separating Adam and the businesses, including joint enterprise, agency, and alter ego, the trial court either determined that these claims had been abandoned at trial or granted directed verdicts favoring Adam and the businesses on the claims. Marcos does not complain about these rulings on appeal or otherwise suggest how Adam could be held responsible in the quantum meruit context for legal services provided to the separate business entities.[7]

### 3. Marcos suffered some damages

We now turn to the pivotal question of whether Marcos conclusively established that he suffered some injury or damages. *See Lufkin Indus.*, 573 S.W.3d at 235-36. As stated, Adam admitted that Marcos performed legal services for himself and his businesses, Marcos's work provided value for Adam and the businesses, and Marcos did not bill or otherwise charge for his time. Adam also recognized that Marcos drafted and filed with the Texas Secretary of State the organizational documents for several of Adam's businesses, including Metro, McKaskle, Kilimanjaro Investments, Isis Investments, and Athena Investments, all

---

[7] This problem was discussed at length during trial. Marcos's counsel argued that because Adam accepted the services on behalf of the companies and ultimately benefitted from the services as an owner of the businesses, he could be held liable for the value of the services rendered. Adam's counsel pointed out that "quantum meruit . . . is not some super alter ego theory." The trial judge appeared to agree that the plaintiffs had problems on this topic, stating:

> I'm going to have to deal with it on motions for [JNOV]. I think you're going to have a very hard time holding on to it in the Court of Appeals because of the complexity of this and the poor recordkeeping. You know, we don't have any bi-client breakout of what actually was done. We don't have any contemporaneous records.

Ultimately, as mentioned, the trial court granted directed verdicts favoring the business entities on all claims; Marcos's claims for joint enterprise, agency, and alter ego were also disposed of; and Marcos does not complain about these rulings on appeal or otherwise explain how Adam could be made liable for services provided to the entities.

18

during the relevant time period. Adam also admitted Marcos handled the buy/sell agreement when Adam bought EBF from its original owner. This work would have been for Adam as the owner of the businesses being created or purchased and not for the businesses themselves.[8] Marcos's spreadsheet shows dozens of hours spent on this work, and Adam did not directly dispute this. The spreadsheet also shows significant time spent on traffic tickets for Adam personally. Adam did not deny that this work occurred, and although his expert, Bristow, criticized the amount of time spent on the tickets, he did not deny that the work had some value to Adam. This evidence establishes that Marcos performed work for Adam for which he was not compensated.

Adam, however, asserts that he and Marcos had a bartering arrangement where each would perform work or have work done for the other. Adam introduced into evidence a listing of vehicle repairs that he asserted were done for Marcos, totaling several thousand dollars. There are a few problems with this evidence. First, the jury found that Adam and Marcos entered a partnership agreement, not a bartering agreement. Second, Adam did not assert that he performed the repairs, as opposed to one of his businesses, and the list itself does not specify who performed the repairs. There was no evidence Adam himself performed repairs or had the capability of doing so. Third, Adam acknowledged one of his businesses received over $6,000 from Marcos's insurance company as compensation for one of the repair jobs. Lastly, Adam did not suggest that the amount of repairs totaled as much as the value of the services Marcos provided to Adam. Thus, neither Adam's testimony about the list nor the list itself negates the

---

[8] This analysis is somewhat complicated for a couple of the entities in question because one of Adam's other entities operated as general partner for those entities and Adam was a limited partner but majority owner.

evidence that Marcos incurred at least some quantum meruit damages.[9] Reasonable and fair-minded jurors could not have disregarded the evidence that Marcos suffered quantum meruit damages. *See generally City of Keller*, 168 S.W.3d at 827.

### 4. Marcos did not conclusively prove the amount of damages

Having determined that Marcos presented conclusive evidence that he incurred damages, we now look to whether he conclusively established the amount of damages, either in the amount awarded by the trial court or otherwise. *See Lufkin Indus.*, 573 S.W.3d at 235-36. The trial court awarded Marcos $405,000 in quantum meruit damages. During post-trial discussion, the judge explained that he calculated the amount awarded by multiplying 7 years by an average of $40,000 worth of legal services per year and then added an additional sum to reimburse Marcos for expenses that he allegedly paid on Adam's behalf.[10]

There is no evidence in the record conclusively supporting this calculation or any other specific amount of damages. As Marcos and his own expert agreed, Marcos encountered substantial difficulties in seeking to place a value on services he had provided years before without the aid of contemporaneous time or activity records. And as Adam's expert pointed out, Marcos's numbers were full of guesswork and strain credulity. Thus, no specific amount of damages was conclusively proven.

---

[9] There was also some evidence that Adam had given Marcos cash over the years. Adam contended this was returns on the money Marcos gave him to invest. Marcos asserted the cash was partial reimbursement for expenses Marcos had paid on Adam's behalf over the years. No one contended that the cash was payment for or otherwise related to the legal services Marcos provided to Adam.

[10] In explaining why he made this calculation, the judge stated "if I have to put a number in to make this thing final, I'll put a number in; and you all can say, well, the Judge just went crazy; and maybe they'll send it back for a retrial on that issue."

**D. Disposition**

Having determined that Marcos conclusively established that he incurred some damages but did not conclusively establish a specific amount of damages, we sustain Adam's first and second issues in part and reverse the trial court's judgment to the extent it awarded quantum meruit damages. Because quantum meruit liability was contested in the court below, we remand for a new trial on both liability and damages on this claim. *See, e.g., Lufkin Indus.*, 573 S.W.3d at 236.

**II. Breach of Contract**

We turn now to Marcos's cross-issues. In his second cross-issue, Marcos asserts that the trial court erred in disregarding the jury's finding that Adam breached the partnership agreement. As stated above, the trial court determined that the alleged partnership agreement was an unenforceable contract and therefore disregarded the jury's breach and damages findings.

**A. Governing Standards**

Marcos alleged that he and Adam entered a partnership agreement for the purpose of creating future joint ventures in which they would split profits 50-50. It is uncontested that the alleged partnership agreement was entered while Marcos and Adam were in an attorney-client relationship. The attorney-client relationship gives rise to a fiduciary relationship as a matter of law. *Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (per curiam); *Izen v. Laine*, No. 14-18-00216-CV, 2020 WL 3273343, at *4 (Tex. App.—Houston [14th Dist.] June 18, 2020, no pet.) (mem. op.). Accordingly, attorneys are held to the highest standards of ethical conduct in their dealings with their clients; they must conduct their business with their clients with inveterate honesty and loyalty and must always keep the client's best interest in mind. *Hoover Slovacek, LLP v. Walton*, 206 S.W.3d 557, 561 (Tex.

2006); *Izen*, 2020 WL 3273343, at *4.

Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 699 (Tex. 2000) (citing *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1964)); *Wilson v. Fleming*, 566 S.W.3d 410, 426 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). Because the relationship is fiduciary in nature, there is a presumption of unfairness or invalidity attaching to such contracts. *Keck, Mahin & Cate*, 20 S.W.3d at 699; *Wilson*, 566 S.W.3d at 426. The burden is on the attorney to prove the fairness and reasonableness of the agreement. *Archer*, 390 S.W.2d at 739; *Dyke v. Hall*, No. 03-18-00457-CV, 2019 WL 5251139, at *10 (Tex. App.—Austin Oct. 17, 2019, no pet.) (mem. op.); *see also Harrison v. Harrison Interests, Ltd.*, No. 14-15-00348-CV, 2017 WL 830504, at *4 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied) (mem. op.) ("Where a transaction between a fiduciary and a beneficiary is attacked, it is the fiduciary's burden of proof to establish the fairness of the transaction."). Moreover, as a fiduciary, Marcos had the burden to establish that Adam was informed of all material facts relating to the agreement. *See Keck, Mahin & Cate*, 20 S.W.3d at 699; *Vu v. Rosen*, No. 14-02-00809-CV, 2004 WL 612832, at *4 (Tex. App.—Houston [14th Dist.] Mar. 30, 2004, pet. denied) (mem. op.). Additional important factors in determining the fairness of a transaction involving a fiduciary include whether the consideration was adequate and whether the beneficiary obtained independent advice. *Wilson*, 566 S.W.3d at 426.

### B. Analysis

Question 2 in the jury charge asked:

> Did Javier Marcos comply with his fiduciary duty to Souhail Adam?

22

As Souhail Adam's attorney, Javier Marcos owed Souhail Adam a fiduciary duty. To prove he complied with his duty, Javier Marcos must show—

1. The transactions in question were fair and equitable to Souhail Adam; and

2. Javier Marcos made reasonable use of the confidence that Souhail Adam placed in him; and

3. Javier Marcos acted in the utmost good faith and exercised the most scrupulous honesty toward Souhail Adam; and

4. Javier Marcos placed the interests of Souhail Adam before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Souhail Adam, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

5. Javier Marcos fully and fairly disclosed all important information to Souhail Adam concerning the transactions.

The jury answered the question, "No."

Adam requested Question 2, and Marcos did not object to it. The question appears to seek a jury finding on Marcos's burden to establish that the partnership agreement and resulting joint ventures were fair and reasonable to Adam and that Adam was informed of all material facts relating to the agreement. We are not asked to and take no position regarding the correctness of the question for this purpose. *See, e.g., Williard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747, 751 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when, as here, there was no objection to the relevant portion of the charge.").

Although Marcos does not expressly challenge the sufficiency of the evidence to support the jury's finding on this issue, he does assert that he presented enough evidence to overcome the presumption of invalidity. However, even if we

23

interpret Marcos's argument as a challenge to the sufficiency of the evidence, the jury's finding was supported by legally and factually sufficient evidence.[11] To successfully challenge the legal and factual sufficiency of the evidence on an issue on which he had the burden of proof, Marcos must show respectively that the evidence conclusively established the opposite of the jury's finding or that the jury's finding was so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Bhatia v. Woodlands N. Houston Heart Ctr., PLLC*, 396 S.W.3d 658, 665 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Marcos specifically argues that the following facts or factors established the fairness of the agreement: (1) by not requesting a jury charge question on damages related to Marcos's alleged breach of fiduciary duties, Adam admitted he suffered no such damages; (2) the jury did not find that Marcos's alleged breach or breaches of fiduciary duties were intentional or malicious; (3) Adam breached his own fiduciary duties as a partner; and (4) Adam received over $1.8 million in free legal services. We are unpersuaded by these arguments. To begin with, Marcos cites no authority suggesting that any of these facts or factors, even if proven or accepted, would establish the agreement was fair and reasonable. Moreover, Adam's requesting a question on breach of fiduciary duty without an attendant damages question was not an admission that Adam suffered no damages; it was a defensive submission aimed at defeating or reducing Marcos's breach of contract claim.

---

[11] When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id*. at 827. Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the conclusion under review. *Id*. In a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We will set aside a finding for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 407.

While the fact Adam was to receive legal services under the purported agreement without paying may be relevant to whether the agreement was fair, this aspect of the agreement alone does not establish the agreement's fairness.

On the other hand, evidence on which the jury could have found the agreement was unfair, inequitable, or that Marcos otherwise breached the duties listed in Question 2 included: Marcos, Adam's attorney, allowed him to agree to a "fist bump" deal without any formal writing; Adam was the only person listed on the formational documents as an owner; while both men supposedly contributed an equal amount of start-up funds, only Adam personally guaranteed the $1 million loan; the "silent partner" nature of Marcos's involvement led to possible violations of bank and tax laws; Adam was to be responsible for daily operations of the businesses while Marcos was to contribute legal services as needed. Also, there was no evidence that Marcos fully informed Adam of the legal ramifications of such an agreement or encouraged Adam to consult independent counsel. As the judge said, Marcos displayed "a disgraceful lack of paying attention to [his] professional obligations."

Because the jury found that Marcos failed to fulfill his fiduciary duties to Adam in regard to the alleged partnership agreement, and the evidence supports that finding, the presumption that the contract was invalid applies. *See Keck, Mahin & Cate*, 20 S.W.3d at 699; *Wilson*, 566 S.W.3d at 426. Thus, the trial court did not err in holding the agreement was invalid and unenforceable. We overrule Marcos's second cross-issue.[12]

### III. Breach of Fiduciary Duty

---

[12] Marcos additionally argues that because the agreement was enforceable, the breach of fiduciary duty found in response to Question 2 is relevant to a fee forfeiture analysis under *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999). Because we hold that the trial court did not err in concluding the agreement was unenforceable, we need not address the fee forfeiture argument.

In his first cross-issue, Marcos contends that the trial court erred in directing a verdict on Marcos's breach of fiduciary duty and fraud claims. We will discuss the breach of fiduciary duty claim first.

A directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *Douglas v. Aguilar*, 599 S.W.3d 105, 108 (Tex. App.—Houston [14th Dist.] 2020, no pet.). In reviewing a directed verdict, we view the evidence in the light most favorable to the party against whom the verdict was rendered. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam). When reviewing a directed verdict on a legal issue, we consider all the evidence presented at trial, viewing it in the complaining party's favor as much as the record allows. *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996).

To recover on a breach of fiduciary duty claim, a plaintiff must prove that (1) a fiduciary relationship existed between the plaintiff and the defendant, (2) the defendant breached his or her fiduciary duty to the plaintiff, and (3) the defendant's breach resulted in an injury to the plaintiff or a benefit to the defendant. *Sklar v. Sklar*, 598 S.W.3d 810, 820 (Tex. App.—Houston [14th Dist.] 2020, no pet.). The only basis Marcos alleges for a fiduciary relationship in which Adam owes fiduciary duties to him is the partnership agreement. As discussed in the previous section, the alleged partnership agreement between Marcos and Adam was invalid and unenforceable. Fiduciary relationships do not arise from unenforceable contracts. *See Knowles v. Wright*, 288 S.W.3d 136, 146-47 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding plaintiff could not establish existence of fiduciary relationship for breach of fiduciary duty claim where purported oral partnership agreement was unenforceable for indefiniteness); *cf. Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 173 (Tex. App.—Houston

26

[1st Dist.] 2011, pet. denied) (holding legal insufficiency of evidence to support partnership finding also negated breach of fiduciary duty finding that was predicated on existence of partnership); *Hoss v. Alardin*, 338 S.W.3d 635, 650 (Tex. App.—Dallas 2011, no pet.) (same).

Without a fiduciary relationship between Marcos and Adam, Adam could not be liable for breaching any fiduciary duties to Marcos; thus, the trial court did not err in granting a directed verdict on Marcos's breach of fiduciary duty claim. *See Sklar*, 598 S.W.3d at 820. We overrule Marcos's first cross-issue in relevant part.

## IV. Fraud

As stated, in his first cross-issue, Marcos also challenges the trial court's directed verdict on his fraud claim. In considering this argument, we utilize the same standards mentioned above for reviewing directed verdicts. *See S.V.*, 933 S.W.2d at 8; *Szczepanik*, 883 S.W.2d at 649; *Douglas*, 599 S.W.3d at 108.

### A. The Law on Fraud

In his pleadings, Marcos raised both common law fraud and fraudulent inducement. A common-law fraud claim requires a material misrepresentation that (1) was false, (2) was either known to be false when made or was asserted without knowledge of its truth, (3) was intended to be acted upon, (4) was relied upon, and (5) caused injury. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance made with no intention of performing at the time it was made. *Id*. Here, Marcos argues that the evidence shows Adam induced him to provide

27

investment funds and years of free legal services by making promises about being partners and that Adam never intended to keep those promises.

Texas recognizes two measures of direct damages for common-law fraud: out-of-pocket damages and benefit-of-the-bargain damages. *Id*. Out-of-pocket damages derive from a restitutionary theory while benefit-of-the-bargain damages derive from an expectancy theory. *Id*. Out-of-pocket damages are measured by the difference between the value expended or parted with versus the value received, thus allowing the injured party to recover based on the actual injury suffered but not lost potential or expected profits. *Id*. Benefit-of-the-bargain damages, on the other hand, are measured by the difference between the value as represented and the value received, thus allowing the injured party to recover profits that would have been made had performance occurred as promised. *Id*.

Although both measures of damages are available for fraudulent inducement, benefit-of-the-bargain damages are not available for fraud that induces a nonbinding contract; rather, if there is a defect in contract formation, the only potentially viable measure of fraud damages is the out-of-pocket measure. *Id*. (citing *Haase v. Glazner*, 62 S.W.3d 795, 799-800 (Tex. 2001)). As discussed above, the alleged partnership agreement between Marcos and Adam was invalid and unenforceable; thus, benefit-of-the-bargain damages are not recoverable under the facts here. *See Haase*, 62 S.W.3d at 799-800.[13]

In granting the directed verdict against Marcos's fraud claims, the trial judge noted a perceived lack of evidence regarding (1) whether Adam had an intention

---

[13] In *Haase*, the court explained that permitting the recovery of benefit-of-the-bargain damages—a typical measure of damages for breach of contract—in a fraudulent inducement case where no contract was formed would allow plaintiffs to circumvent the laws pertaining to the enforceability of contracts. 62 S.W.3d at 799. In *Haase*, the alleged contract was unenforceable because it violated the statute of frauds. *Id*.

not to perform his promises at the time made and (2) the proper measure of damages, in this case, out-of-pocket damages. We will look at each in turn.

## B. Evidence of Intent

A fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract. *Formosa Plastics*, 960 S.W.2d at 46. Intent is typically a fact question for the jury as it often turns on witness's credibility and the weight to be assigned to their testimony. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *Burton v. Prince*, 577 S.W.3d 280, 289 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Because intent to defraud is not usually susceptible to direct proof, circumstantial evidence is typically required. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774-75 (Tex. 2009).

In this context, there must be evidence relevant to intent when the promise was made. *See Formosa Plastics*, 960 S.W.2d at 48; *Anglo-Dutch Petroleum Int'l, Inc. v. Smith*, 243 S.W.3d 776, 780 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Intent to defraud may be inferred from a party's subsequent acts after a promise is made. *Aquaplex*, 297 S.W.3d at 775; *Spoljaric*, 708 S.W.2d at 434. The failure to perform a promise standing alone is not sufficient to establish this intent, but it is a circumstance the jury can consider along with other facts to establish intent. *Spoljaric*, 708 S.W.2d at 435; *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). A party's denial that a promise was ever made may also be a factor but is not alone sufficient to establish intent. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 & n.18 (Tex. 2006); *Spoljaric*, 708 S.W.2d at 435; *Moore v. Altra Energy Techs., Inc.*, 321 S.W.3d 727, 738 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). However, a breach of the promise plus "slight circumstantial evidence" is usually

sufficient. *See Spoljaric*, 708 S.W.2d at 435; *SEECO*, 416 S.W.3d at 671.

Here, there was certainly at least some evidence that Adam made a promise to partner with Marcos, splitting profits from certain businesses 50/50, and did not perform that promise. Marcos expressly testified regarding the promise, and there was evidence Adam allowed Marcos and Marcos's wife to represent that the two were partners without correcting them. It is undisputed that Adam kept the profits from the alleged partnership joint ventures and subsequently denied the partnership ever existed. As stated, both breach of the promise and denial that a promise were made are circumstances that a jury could consider in determining a party did not intend to fulfill a promise when the promise was made. *See Tony Gullo*, 212 S.W.3d at 305 & n.18; *Spoljaric*, 708 S.W.2d at 435; *SEECO*, 416 S.W.3d at 671; *Moore*, 321 S.W.3d at 738.

Marcos also testified that it was Adam's idea from the start that Marcos be a "silent partner" who was not listed on the formational documents. This was at least some slight circumstantial evidence that Adam made the promise never intending to perform. According to Marcos, Adam explained that not identifying Marcos as a partner would allow Marcos to represent the joint ventures in legal matters without revealing the potentially complicating fact of his ownership. However, a jury could view this evidence as an indication Adam never actually intended to partner with Marcos and instead made a fraudulent promise to do so.

### C. Evidence of Damages

As stated, the proper measure of damages for when fraud induces a nonbinding contract is the out-of-pocket measure. *See Zorrilla*, 469 S.W.3d at 153; *Haase*, 62 S.W.3d at 799-800. Marcos asserts that his out-of-pocket damages included the $250,000 he provided at the time that Metro was formed, the legal services he provided for years without charging, and the fees and expenses he paid

on Adam's or Adam's businesses' behalf. The evidence supporting these elements of damages is certainly not without its problems. Adam testified that Marcos only contributed $230,000, and it was uncontested that Adam returned $230,000 to Marcos before trial. As discussed in detail above, Marcos's evidence regarding the value of the legal services he provided was fraught with difficulties. There was also evidence that Marcos had received free repairs to his car in exchange for his legal services and that Adam had paid Marcos back for at least some of the fees and expenses.

However, there was at least some evidence that Marcos suffered out-of-pocket damages due to Adam's allegedly fraudulent promise. Marcos's testimony suggested Adam kept $20,000 of the initial investment. Adam admitted that Marcos provided legal services for Adam and his businesses that added value and then did not bill or invoice for those services. Marcos testified that he did this because he thought it was pursuant to the partnership agreement he believed he had with Adam. Also, according to Marcos, Adam still owed him for at least some fees and expenses. Because there was evidence Marcos sustained out-of-pocket damages, the trial court erred to the extent it directed a verdict on Marcos's fraud claims based on a lack of evidence of damages. *See, e.g., Haase*, 62 S.W.3d at 799-800 (noting party raised possibility of out-of-pocket damages by claiming he made "efforts concerning demographics, decor, potential profits, and location," hired a surveyor, and entered into an earnest-money contract for a restaurant site).

Because there is more than a scintilla of evidence that Adam intended not to perform at the time that he allegedly promised to be Marcos's partner on future joint ventures and there is more than a scintilla of evidence that Marcos incurred out-of-pocket damages as a result, the trial court erred in granting a directed verdict against Marcos's fraud claim. *See Coastal Transp. Co. v. Crown Cent.*

*Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). Accordingly, we sustain his first issue in part.

### *Disposition*

We reverse the portions of the trial court's judgment awarding damages and attorney's fees to Marcos on his quantum meruit claim. We further reverse the trial court's grant of a directed verdict against Marcos's fraud claims. We remand the quantum meruit and fraud claims for further proceedings in accordance with this opinion. We affirm the remainder of the judgment.

/s/    Frances Bourliot
Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.